ams

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 07-40021-JAR |
| JESUS A. BASTIDAS-FIGUEROA and SANTOS A. BASTIDAS-VALDEZ, | ) ) ) ) |
| Defendants. | ) ) ) |

## MEMORANDUM ORDER

This matter comes before the Court on defendant Jesus A. Bastidas-Figueroa's Motion to Suppress Statement (Doc. 34), defendant Bastidas-Figueroa's Motion to Suppress and Memorandum Brief in Support (Doc. 35), and defendant Bastidas-Valdez's Motion to Suppress (Doc. 39).[1]  Defendants move to suppress evidence obtained after a traffic stop and subsequent search of the vehicle they were traveling in on February 27, 2007; and defendant Bastidas-Figueroa seeks suppression of his post-arrest statement.   The Court held a hearing on defendants' motions on July 27, 2007.  After reviewing the parties' filings and the evidence adduced at the hearing, the Court is now prepared to rule.  For the reasons stated below, defendants' motions to suppress evidence derived from the traffic stop are denied and defendant Bastidas-Figueroa's motion to suppress statement is granted.

---

[1]The Court orally granted a motion by defendant Bastidas-Valdez to join pretrial motions filed by his co-defendant. (Doc. 45.)  As a practical matter, the Court is unsure how this joinder benefits defendant Bastidas-Valdez.  He did proceed to file his own motion to suppress, but did not contend in any filing that statements he made after his arrest should be suppressed, as defendant Bastidas-Figueroa did.  Defendant Bastidas-Figueroa's motion to suppress statement contains no information about any interrogation of defendant Bastidas-Valdez.

**I.  Factual Background**

On the evening of February 27, 2007, Troopers Epperly and Patrick were sitting in a median, monitoring a portion of Interstate 70 that was near a "ruse lane," around milepost 155 in Ellis County, Kansas.[2]  At approximately 7:45 p.m., the troopers noticed a Dodge Stratus traveling east and they could not tell if there was a license tag on the vehicle.  The troopers still could not see a license tag after getting behind the vehicle, nor could they see the tag when they attempted to shine a flashlight on it from their patrol car.  The troopers decided to stop the vehicle, and approached it on foot.  Once he was about one to two feet away from the vehicle, Trooper Epperly saw what appeared to be a temporary tag on the rear bumper of the vehicle, where a regular tag would normally appear.  The tag was covered with a hard plastic shield, which was covered with dirt, preventing the troopers from observing the tag.

The troopers then made contact with the two occupants of the vehicle; Trooper Patrick approached the driver's side and Trooper Epperly approached the passenger side and requested the occupants' identification and an insurance card.  Trooper Epperly noted a significant age difference between the two men, who are in fact father and son.[3]  Both occupants, the defendants, were citizens of Baja, California in Mexico so Trooper Epperly spoke to them in a combination of English and Spanish during the course of the traffic stop.  Defendant Bastidas-Figueroa was driving the vehicle.  Defendant Bastidas-Valdez, who was the passenger, claimed

---

[2]A ruse lane is utilized by law enforcement for drug interdiction purposes.  Typically, law enforcement places a sign just prior to an exit ramp that states that there is a drug checkpoint ahead.  The cars that exit off of the nearby ramp are then stopped based on a reasonable suspicion that they are avoiding the checkpoint because they are carrying narcotics.

[3]Trooper Epperly testified that he was unable to ask the men about the age gap because of the language barrier.

to own the vehicle but the insurance card was in the name of a third party, Carlos Lopez, who was not present in the vehicle. The vehicle had been purchased in Arizona. Trooper Epperly asked the defendants where they were going and they told him that they were driving from California to Topeka to stay for about three days. Trooper Epperly noticed that there was a small duffel bag in the back seat of the vehicle, and he also noticed energy drinks in the center console. It appeared to Trooper Epperly that they were driving straight through from California to Topeka.

The troopers returned to their patrol car for a period of time and then Trooper Epperly returned the documentation to the men, told them that it was hard to see their tag and that they should take the plastic cover off, and then said "adios." Trooper Epperly took a couple of steps away from the car and then turned around and asked, "uno momento por favor"? He told them that he noticed they were traveling from California to Kansas and asked if they were carrying illegal "drogas" in the car. Then, Trooper Epperly asked, "Is it O.K. if I buscar su caro por drogas"? The men agreed and Trooper Epperly said "gracias." Defendants got out of the car and waited in or near the patrol car while Trooper Epperly searched.

During the search of the vehicle, Trooper Epperly discovered that one of the bolts holding the gas tank on the vehicle had recently been tooled and removed. He then used a fiberoptic scope to look into the tank, at which point he observed a floating package. Trooper Epperly instructed the defendants to follow him in the vehicle to the Ellis County patrol building, where he could disassemble the gas tank and retrieve the items inside. That search revealed five plastic-sealed packages that amounted to approximately five pounds of a mixture or substance containing a detectable quantity of methamphetamine.

Defendants were then arrested and later interviewed. According to the government's brief, after preliminary booking questions, a translator read defendant Bastidas-Figueroa *Miranda* warnings and he consented to questioning without an attorney. Defendant Bastidas-Figueroa told officers that he and his father, defendant Bastidas-Valdez, both knew that they were carrying drugs and that they were being paid to drive the vehicle to Topeka from California. After this admission, defendant Bastidas-Figueroa asked for an attorney. Defendant Bastidas-Figueroa contends, however, that he requested an attorney after he was read his *Miranda* rights, and that he refused to sign a waiver of his rights. Nonetheless, defendant Bastidas-Figueroa maintains that questioning continued, which led to his statement.

## II.  Motions to Suppress Evidence Obtained from Search of the Vehicle

"'A traffic stop is a "seizure" within the meaning of the Fourth Amendment, even though the purpose of the stop is limited and the resulting detention quite brief.'"[4] The principles of *Terry v. Ohio*[5] apply to such traffic stops. Thus, the reasonableness of a stop depends on "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."[6]

### *A. Standing*

The government argues that neither defendant has standing to contest the search of the vehicle since they do not own it. "[D]uring a traffic stop an officer seizes everyone in the

---

[4]*United States v. Holt*, 264 F.3d 1215, 1220 (10th Cir. 2001) (en banc) (quoting *United States v. Hunnicutt*, 135 F.3d 1345, 1348 (10th Cir. 1998) (further quotation omitted)).

[5]392 U.S. 1 (1968).

[6]*Id.* at 19–20.

4

vehicle, not just the driver."[7]  And, occupants of a vehicle are "seized" if "a reasonable person in [defendant's] position when the car [was] stopped would have believed himself free to 'terminate the encounter' between the police and himself."[8]  A traffic stop certainly constitutes a seizure, in that a reasonable person, even a passenger, would not feel free to leave.[9]  For this reason, both the passenger as well as the driver, may bring a Fourth Amendment challenge to the legality of a traffic stop.  Because both defendants were seized during the traffic stop at issue here, they have standing to contest the search.

### B. The Initial Stop

Tenth Circuit cases establish that "a detaining officer must have an objectively reasonable articulable suspicion that a traffic violation has occurred or is occurring before stopping [an] automobile."[10]  Reasonable suspicion may be supported by an "objectively reasonable" good faith belief even if premised on factual error.[11]  The troopers stopped defendants believing the vehicle did not comply with K.S.A. § 8-133, which provides in relevant part:

> Every license plate shall at all times be securely fastened to the vehicle to which it is assigned so as to prevent the plate from swinging, and at a height not less than 12 inches from the ground, measuring from the bottom of such plate, in a place and position to be clearly visible, and *shall be maintained free from foreign materials and in a condition to be clearly legible* (emphasis

---

[7]*Brendlin v. California*, 127 S. Ct. 2400, 2406 (2007).

[8]*Id.*

[9]*See id.*

[10]*United States v. Cervine*, 347 F.3d 865, 869 (10th Cir. 2003); *United States v. Soto*, 988 F.2d 1548, 1554 (10th Cir. 1993).

[11]*United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004).

5

added).

Defendants argue that because the temporary Arizona tag was affixed to the vehicle and covered with the plastic shield, it complied with the statute. The government maintains that the plastic shield was covered with dirt, so the violation was because it was not "maintained free from foreign materials." The Court agrees. Trooper Epperly testified that since it was a temporary tag, it was not reflective, especially with the plastic cover over it. The troopers attempted to shine a flashlight on the tag and could still not make out the state of origin, or the number. Even after stopping the vehicle and approaching it on foot, Trooper Epperly was only able to tell from about one to two feet away that the tag was a temporary Arizona tag. Further, the photograph of the tag clearly shows dirt covering the plastic cover over the tag.[12] Because the tag was obstructed by debris and the plastic tag itself, the troopers had an objectively reasonable articulable suspicion that a traffic violation had occurred; thus, the stop was justified at its inception.

*C. Detention*

Even if the initial stop of defendants' vehicle was legitimate, the detention must be "reasonably related in scope to the circumstances which justified the interference in the first place," as required under *Terry*.[13] "Generally, an investigative detention must last no longer than is necessary to effectuate the purpose of the stop."[14] However, "an officer conducting a traffic

---

[12](Def. Ex. 2001.)

[13]*United States v. Williams*, 271 F.3d 1262, 1266 (10th Cir. 2001), *cert. denied*, 535 U.S. 1019 (2002); *United States v. Bustillos-Munoz*, 235 F.3d 505, 512 (10th Cir. 2000), *cert. denied*, 534 U.S. 854 (2001).

[14]*United States v. Cervine*, 347 F.3d 865, 870–71 (10th Cir. 2003) (internal quotation omitted); *United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999).

stop may request vehicle registration and a driver's license, run a computer check, ask about travel plans and vehicle ownership, and issue a citation."[15] Upon issuing a citation or warning and determining the validity of the driver's license and right to operate the vehicle, the officer usually must allow the driver to proceed without further delay.[16]

Defendants argue that they should not have been detained any further based on *United States v. Edgerton*.[17] In *Edgerton*, a trooper stopped a vehicle that displayed only a temporary registration tag in the rear window. Because it was nighttime, the trooper was unable to read the state of origin or the numbers on the temporary tag, so he stopped the vehicle. The tag was not obscured in any way, and when the trooper shone his flashlight on the tag, he was able to read it. Then, the trooper asked for the defendant's driver's license and registration papers, which she provided. The trooper prepared a warning citation for a violation of K.S.A. § 8-133. After returning the defendant's license and registration with the citation, the trooper asked and received consent to search the vehicle, leading to the discovery of twenty kilograms of cocaine.

The court in *Edgerton* found that the search was justified at its inception because the trooper had a reasonable suspicion that a traffic violation occurred.[18] Nevertheless, the court held that the detention was unreasonably extended by the trooper asking for defendant's license

---

[15]*United States v. Zubia-Melendez*, 263 F.3d 1155, 1161 (10th Cir. 2001); *see Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[a] seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission.").

[16]*United States v. Patten*, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)).

[17]438 F.3d 1043 (2006).

[18]*Id.* at 1048.

and registration because he was able to read the tag clearly upon shining his flashlight on it.[19] The court noted that the government was unable to cite to anything in Kansas law forbidding the placement of a tag in the rear window of the vehicle, or directing it to be fixed at any particular place on the vehicle.[20] The court reasoned that the tag was only illegible to the trooper due to external conditions—i.e. the darkness.[21]

The government contends, and the Court agrees, that this case is distinguishable from *Edgerton* because here, it was not an external or natural condition that prevented the troopers from observing the temporary tag. Instead, the tag was obscured by dirt and the plastic cover.[22] Unlike in *Edgerton*, the suspicion that defendants had violated K.S.A. § 8-133 had not dissipated after approaching the vehicle. In fact, once Trooper Epperly approached the back of the vehicle on foot, the information was still difficult to read from one to two feet away. The fact that the tag was obstructed allowed for the detention of defendants long enough for Trooper Epperly to request driver's licenses, vehicle registration, and ask about the occupants' travel plans.

### D. *Consent and Reasonable Suspicion*

A longer detention for additional questioning is permissible under two circumstances: (1) where the officer has an objectively reasonable and articulable suspicion that illegal activity has

---

[19]*Id.* at 1051 ("any suspicion that Defendant had violated § 8-133 dissipated because the tag was in [sic] 'in a place and position to be clearly visible.'").

[20]*Id.* at 1050.

[21]*Id.*

[22]*See, e.g.*, *United States v. Ledesma*, 447 F.3d 1307, 1313–14 (10th Cir. 2006) (displaying tag in unlawful manner even after the trooper approached the vehicle and was able to read it, made it reasonable under the circumstances for trooper to ask for license and registration and ask preliminary questions about travel plans).

8

occurred or is occurring; or (2) the initial detention changes to a consensual encounter.[23]  If the officer continues to question the driver in the absence of either of these two circumstances, then "any evidence derived from that questioning (or a resulting search) is impermissibly tainted in Fourth Amendment terms."[24]  But, if an encounter between a police officer and a motorist is consensual, the Fourth Amendment ban on unreasonable searches and seizures does not come into play.

Defendants argue that the consent here was not voluntary because they were unable to understand Trooper Epperly due to the language barrier, they were not informed that they could refuse consent, and they were not informed of their *Miranda* rights.  The government responds that the consent was voluntary and, in the alternative, Trooper Epperly developed reasonable suspicion of criminal activity by the time he searched the vehicle.

### 1.  Consent

"Valid consent is consent which is freely and voluntarily given."[25]  Voluntariness of consent is a question of fact to be determined from all the circumstances; a court should neither presume that the consent was voluntary nor involuntary.[26]  The government bears the burden of proving that consent was voluntary under the totality of the circumstances.[27]  To satisfy this burden, the government must show that the consent was unequivocal and specific and freely and

---

[23] *United States v. Cervine*, 347 F.3d 865, 871 (10th Cir. 2003).

[24] *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir. 1997) (internal quotations and citations omitted).

[25] *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999).

[26] *United States v. Hernandez*, 93 F.3d 1493, 1500 (10th Cir. 1996).

[27] *United States v. Gregoire*, 425 F.3d 872, 879 (10th Cir. 2005); *Patten*, 183 F.3d at 1194.

voluntarily given.[28]  Mere submission to lawful authority does not equate to valid consent.[29] Language barriers are relevant in evaluating a defendant's ability to act knowingly, intelligently, and voluntarily.[30]

After returning defendants' documents, Trooper Epperly told defendants "adios" and then took a couple of steps away from the vehicle.  Trooper Epperly testified that he never leaned into the car, did not grab his weapon, and did not use an aggressive or commanding tone of voice when he asked for consent.  Instead, after taking a couple of steps away, he asked if the defendants had a problem with him searching the vehicle.

Trooper Epperly testified that he speaks a small amount of Spanish and that the defendants spoke a small amount of English, but that his Spanish was good enough to establish basic communication during a traffic stop.  Trooper Epperly further testified that although his Spanish is broken, he is able to obtain correct responses to his questions and he can tell when someone he is questioning does not understand him.  When he asked to search, Trooper Epperly asked if he could "buscar su caro."  While this is not a literal translation for asking if he can search the vehicle, he testified that he had never had anyone indicate that they did not understand that question.  Trooper Epperly testified that the defendants did not appear confused when he asked them this question and never attempted to ask him any questions before saying yes.

While Trooper Epperly never advised defendants that they had the right to refuse

---

[28]*United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998).

[29]*United States v. Manuel*, 992 F.2d 272, 275 (10th Cir. 1993).

[30]*United States v. Hernandez*, 893 F. Supp. 952, 961 (D. Kan. 1995), *aff'd*, 103 F.3d 145 (10th Cir. 1996).

consent, the Tenth Circuit has "reject[ed] the suggestion that the trooper's failure to advise [defendant] that he was free to leave, or that he could refuse consent to search, render[s] the consent involuntary"[31] when the events occurring before the search were lawful. Further, defendants do not explain why the troopers were required to *Mirandize* defendants at this point given that it was a consensual encounter and no illegal activity had turned up prior to the search. The Court determines that Trooper Epperly lawfully obtained consent to search the vehicle under the totality of the circumstances.

### 2. Reasonable Suspicion

Even if the Court found that defendants' consent was not knowing and voluntary, Trooper Epperly had developed reasonable and articulable suspicion that illegal activities were taking place during the course of the traffic stop sufficient to justify the continued detention and search. According to his testimony, several factors contributed to Trooper Epperly's reasonable suspicion of illegal activity: (1) defendants were traveling on a well-known drug route between California and Topeka and were residents of Baja, California in Mexico; (2) the vehicle was registered to a third-party who was not present in the vehicle; (3) there was a small overnight bag in the back seat and energy drinks in the center console at 7:45 p.m., suggesting defendants were driving straight through; and (4) the fact that there were two men in the vehicle of such significantly different ages. These factors provided reasonable suspicion that illegal activity was occurring and justified a prolonged detention of defendant, even in the absence of consent.

Because the consent was voluntary and Trooper Epperly had developed reasonable suspicion of illegal activity, the search of the vehicle was justified under the Fourth Amendment

---

[31]*United States v. Gregoire*, 425 F.3d 872, 880 (10th Cir. 2005).

and defendants' motions to suppress evidence obtained from the search are denied.

### III.  Motion to Suppress Statements

Defendant Bastidas-Figueroa maintains that after he was arrested and advised of his *Miranda* rights, he requested an attorney and refused to sign a waiver of his rights.  Yet, defendant Bastidas-Figueroa argues that the officers interrogating him became angry and continued questioning him, leading to his incriminating statements.  The government argues in its brief that defendant Bastidas-Figueroa did waive his right to counsel prior to interrogation.

A law enforcement officer's "failure to administer *Miranda* warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and the confession is inadmissible with no need for the 'time consuming and difficult enquiry into voluntariness.'"[32]  For the *Miranda* safeguards to apply, (1) "the suspect must be in 'custody,' and [(2)] the questioning must meet the legal definition of 'interrogation.'"[33]  The government bears the burden of showing that these rights were waived and that the statements were made voluntarily.[34]  "But '[a]n express statement of waiver by the defendant is not required; instead, waiver can be inferred from the defendant's actions and words.'"[35]

At the July 27, 2007 hearing, the only evidence presented by the government pertained to the traffic stop: the videotape of the stop and the testimony of Trooper Epperly.  The

---

[32]*United States v. Pettigrew*, 468 F.3d 626, 635 (10th Cir. 2006) (quoting *Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (quoting *United States v. Patane*, 542 U.S. 630, 646 (2004) (Souter, J., dissenting))), *cert. denied*, 127 S. Ct. 1343 (2007).

[33]*United States v. Ritchie*, 35 F.3d 1477, 1485 (10th Cir. 1994) (quoting *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993)).

[34]*Missouri v. Seibert*, 542 U.S. 600, 609 n.1 (2004) (plurality); *United States v. Nelson*, 450 F.3d 1201, 1209 (10th Cir. 2006), *cert. denied*, 127 S. Ct. 326 (2006).

[35]*Nelson*, 450 F.3d at 1209 (quoting *United States v. Toro-Pelaez*, 107 F.3d 819, 825 (10th Cir. 1997)).

investigative report referenced in the government's brief was not attached as an exhibit thereto, nor was it introduced at the hearing. Because there is no evidence in the record on this issue and because the government bears the burden of showing that defendant Bastidas-Figueroa waived his right to counsel, the Court is unable to infer waiver or the voluntariness of any post-arrest statement made by him. Accordingly, the Court grants defendant Bastidas-Figueroa's motion to suppress statement.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Jesus A. Bastidas-Figueroa's Motion to Suppress Statement (Doc. 34) is **granted**, defendant Bastidas-Figueroa's Motion to Suppress and Memorandum Brief in Support (Doc. 35) is **denied**, and defendant Bastidas-Valdez's Motion to Suppress (Doc. 39) is **denied**.

**IT IS SO ORDERED**.

Dated this 6th day of August 2007.

    S/ Julie A. Robinson
Julie A. Robinson
United States District Judge